946 F.2d 888
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Cathy Arrowood WALKER, Plaintiff-Appellee,
v.
SULLAIR CORPORATION, Defendant-Appellant,
and
John LEWIS, Defendant.
Cathy Arrowood WALKER, Plaintiff-Appellant,
v.
SULLAIR CORPORATION, Defendant-Appellee,
and
John LEWIS, Defendant.
 Nos. 90-2124, 90-2132.
 United States Court of Appeals, Fourth Circuit.
 Argued June 3, 1991.
Decided Oct. 3, 1991.
 
 Appeals from the United States District Court for the Western District of North Carolina, at Charlotte. James B. McMillan, Senior District Judge. (CA-87-215-C-C-M)
 Argued: Phillip Marshall Van Hoy, Van Hoy & Reutlinger, Charlotte, N.C., for appellant.
 Mark A. Michael, Michael & Meierhoefer, Charlotte, N.C., for appellee.
 W.D.N.C., 736 F.Supp. 94.
 AFFIRMED IN PART AND REVERSED IN PART.
 Before K.K. HALL and PHILLIPS, Circuit Judges, and ELLIS, United States District Judge for the Eastern District of Virginia, Sitting by Designation.
 OPINION
 PHILLIPS, Circuit Judge:
 
 
 1
 This is an appeal following trial of the Title VII and state-law tort claims of Cathy Arrowood Walker against her former employer, Sullair Corporation (Sullair). Before a jury, Walker prevailed on an intentional infliction of emotional distress claim and was awarded compensatory and punitive damages in the amount of $103,500. Sitting as the trier of fact on the Title VII claim, however, the District Court ruled in favor of the defendant, Sullair. Because we conclude that Walker's evidence was insufficient to support a finding of liability on Walker's state-law claim, we reverse the court's denial of Sullair's motion for judgment notwithstanding verdict. On the other hand, finding no error in the court's dismissal of Walker's Title VII claim, we affirm that dismissal.
 
 
 2
 * Cathy Walker was employed as a clerical employee in Sullair's Charlotte, North Carolina office beginning in 1981. Between 1982 and 1984, Walker engaged in consensual sexual relations with a manager in her department, Jon Lewis, on several occasions. The parties agree that Lewis neither threatened Walker, nor offered her any special treatment as an employee in exchange for her participation. In late 1982, shortly after their first liaison, Walker was hospitalized for six weeks, receiving psychiatric treatment for severe headaches. Lewis and Sullair were aware of the fact that Walker had been hospitalized for these headaches. In April 1985, about nine months after Lewis and Walker engaged in sexual relations for the last time, Walker married another person.
 
 
 3
 Walker introduced evidence indicating that, after Lewis and Walker ended their sexual relationship, Lewis began to abuse Walker verbally in the office and entered a series of negative evaluations in her personnel file. The gist of her claim in this action is that this negative treatment was a direct result of the discontinuation of their sexual relationship. In support, she has relied on the fact that from 1981 to 1985, her personnel file reflected excellent job performance reviews; but that after April of 1985, Lewis began entering a series of negative comments in her file. Walker has conceded, however, that most of these comments were in fact accurate descriptions of her conduct, specifically, that she arrived late to work, talked extensively on personal phone calls during work hours, and took extended lunch hours.
 
 
 4
 By the summer of 1986, Walker and her supervisor, Bob Bogaert, had filed complaints with the Employee Relations division of Sullair. These complaints implied--but did not state clearly--the earlier sexual affair between Lewis and Walker and that her alleged workplace abuse might be related to the ending of that liaison. In August 1986, Walker contacted the Equal Employment Opportunity Commission. She claimed in this litigation that she informed Sullair of this fact, and that the company requested that she refrain from making a formal filing until an internal investigation could be performed. Two Sullair personnel officials, based in Indiana, later visited the Charlotte office. They interviewed most of the employees in the office. With the exception of Bogaert and Lola Jones, a friend of Walker's, Walker's fellow employees overwhelmingly agreed that Walker was receiving privileged treatment from Lewis. These fellow employees stated that Lewis tolerated tardiness, poor attendance, and other poor conduct from Walker. Walker testified that, following these interviews, the Sullair personnel officials told Walker that she was overreacting to Lewis' sense of humor and that she should be careful not to damage his good reputation. They then returned to Indiana where their notes from the investigation were lost or destroyed.
 
 
 5
 Shortly after this visit, Walker "collapsed, physically and emotionally". Since September 1986, she has remained under the care of a psychiatrist.
 
 
 6
 In September of 1986, Walker filed charges with the EEOC, which issued a right-to-sue letter. Walker then brought this action against Sullair and Lewis, alleging violations of Title VII by workplace sexual harassment and parallel state tort claims of malicious prosecution and intentional infliction of emotional distress. Following denial of Sullair's motion for summary judgment, the case went to trial which resulted in a hung jury on the state-law tort claims. After this trial, Walker settled her claims against Lewis and the action against him was dismissed with prejudice. The case was then retried solely against Sullair. On the retrial, the jury returned a verdict for Walker on the intentional infliction claim only, awarding compensatory and punitive damages totalling $103,500. The jury rejected the malicious prosecution claim. The district court, however, sitting as trier of fact on the same evidence, found in favor of Sullair on the Title VII sexual harassment claim. Sullair then moved for judgment notwithstanding the verdict on the emotional distress claim, which the court denied. Sullair and Walker both appeal.
 
 II
 
 7
 The first issue is whether the district court erred in denying Sullair's motion for JNOV on the grounds that the evidence at trial was insufficient, under North Carolina tort law, to support the verdict of intentional infliction of emotional distress.
 
 
 8
 Here we encounter at the start a procedural muddle to which both parties have contributed. At trial, the record seems to indicate fairly clearly that Walker proceeded, at least alternatively, on a theory of Sullair's vicarious liability for Lewis' conduct. Evidence of that conduct was introduced without objection, and the district court instructed the jury in a way which suggested that Lewis' conduct was relevant to the claim. Sullair, for its part, did not object to this aspect of the instructions. The jury's verdict gives no indication of the theory upon which it found Sullair liable, whether for its own conduct in dealing with Walker, or vicariously for Lewis' conduct.
 
 
 9
 On this appeal, Sullair has raised the point that under North Carolina law, Walker's settlement and voluntary dismissal of her claim against Lewis in advance of the second trial against Sullair alone precluded any vicarious liability claim against Sullair. See Harrison v. Edison Bros. Apparel Stores, Inc., 924 F.2d 530, 534 (4th Cir.1991) (citing North Carolina authority). This presents a potential problem: it is not too clear that Sullair ever raised this point--effectively a defense of issue preclusion--in the district court. But, as things developed, Walker has in turn effectively removed that problem by conceding on appeal that the vicarious liability claim is precluded under North Carolina preclusion law. This then leaves her with the necessity to invoke some other theory of liability upon which to sustain her verdict. She has advanced one. Contending that she has never relied upon vicarious liability, she claims now and always only to have sought to prove Sullair's direct liability for intentionally inflicting emotional distress upon her.
 
 
 10
 We might well be dubious, given the record of trial, that this was the only theory upon which her claim against Sullair was tried and submitted to the jury. But, for purposes of this appeal, we may assume that it was, because if it was, entitling Walker to rely upon it here, the evidence is insufficient to support such a theory of direct liability.
 
 
 11
 Her contention, advancing this theory, is that Sullair's conduct, independently of Lewis'--specifically its "refusal to take timely remedial measures once the problem [of Lewis' misconduct] was brought to its attention"--constituted a direct, intentional infliction of emotional distress upon her. The specific evidence to which she points, in addition to Sullair's ultimate non-action, is that concerning the failure of the Sullair employees sent from the Indiana office to take any remedial action following their investigative visit, and their positive discouragement of any effort by Walker to pursue remedial action against Lewis.
 
 
 12
 Simply put, such conduct, essentially non-action, no matter how blameworthy if it did indeed occur as Walker contends her evidence shows, does not approach the level of "outrageousness" which is the crux of this tort under North Carolina law.
 
 
 13
 North Carolina, as do other jurisdictions which in recent years have recognized this drastic tort, imposes a most stringent standard for its proof. A claimant must establish (1) extreme and outrageous conduct, (2) which is intended to cause and does cause, (3) severe emotional distress. Dickens v. Puryear, 276 S.E.2d 325, 335 (N.C.1981). As the Restatement (Second) of Torts has commented upon the type of conduct which this tort makes culpable, it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. § 46, comment d (1965). That standard of course excludes a great deal of conduct that is undoubtedly very bad and is properly considered reprehensible. The North Carolina cases applying the standard in the employment context mainly illustrate just how bad and reprehensible conduct must be to constitute the level of outrageousness required to impose liability for this tort. The following are examples of employers' treatment of employees found to fall short of that level: wrongful discharge of an employee by an official who knew that the employee's professional standing was the most important thing in her life, and who nevertheless deliberately assembled groups of her fellow employees to report to them that the employee was discharged for "a lack of credibility," Trought v. Richardson, 338 S.E.2d 617 (N.C.App.1986); refusing to grant an employee pregnancy leave, requiring her to carry heavy objects during pregnancy, and discharging her when she took leave without permission to visit the hospital for medical attention, Hogan v. Forsyth Country Club, Co., 340 S.E.2d 116 (N.C.App.1986); discharging an employee in a manner that was "abrupt, without cause, and unexplained," McKnight v. Simpson's Beauty Supply, Inc., 358 S.E.2d 107 (N.C.App.1987).
 
 
 14
 North Carolina cases finding conduct sufficiently "outrageous" to impose liability under this tort seem to have been confined to instances of actual physical assault, deliberate subjection to public embarrassment or shame, and the like. Thus, in Hogan, allegations of sexual touching, sexually suggestive comments, and ongoing sexual harassment were held to state a viable claim; in Dickens, conduct that involved luring the claimant to a secluded location, holding him at gunpoint, handcuffing him to a piece of machinery, cutting his hair with a knife, beating him with nightsticks, threatening him with castration and death, and ordering him to leave the state, was found sufficiently "outrageous" to meet the standard; and in West v. King's Dep't Store, Inc., 365 S.E.2d 621 (N.C.1988), the public detention for over an hour of a person falsely accused of shoplifting was found sufficiently outrageous.
 
 
 15
 Here, with any claim of vicarious liability for Lewis' conduct out of the way, Walker is left with Sullair's failure to take remedial action respecting a workplace situation that, if proven as alleged, was undoubtedly a bad one that it had some duty to remedy. But it is obvious that such a default, no matter how irresponsible, unaccompanied by any deliberate public humiliation or the like, could not rise to the level of outrageousness which the North Carolina cases demonstrate is required.
 
 
 16
 Accordingly, we conclude that if, as Walker has now conceded, the only claim properly before the district court was one of Sullair's direct liability for intentional infliction of emotional distress, the district court erred (though understandably in view of the confused litigation position of both parties at that point) in refusing to grant Sullair's motion for JNOV.
 
 III
 
 17
 Walker's cross-appeal challenges the district court's rejection on the merits of her Title VII claim against Sullair charging its failure to remedy a "hostile workplace environment" created by Lewis' sexual harassment. She claims that the jury's verdict in her favor on her intentional infliction of emotional distress claim required that the district court accept the jury's findings of fact underlying that verdict, and that this in turn would require finding for her on her parallel "hostile workplace environment" Title VII claim. Her general premise is correct: where common issues of fact are raised in parallel Title VII claims triable to the court and pendent state tort claims triable to a jury, the jury's findings on those issues are binding on the court sitting as trier of fact on the parallel claims. Lytle v. Household Mfg., Inc., 494 U.S. 545 (1990). Her conclusion fails here, however.
 
 
 18
 For the reasons discussed in Part II, it is now established that Walker's state-law claim against Sullair was one of direct, not vicarious, liability. That claim has now been found insufficiently supported by the evidence to support the jury's verdict upon it. Whether under the circumstances there were dispositive common issues in the Title VII claim and the state-law claim of direct liability may be questionable, but in any event is now irrelevant. Because the jury's verdict has now been found unsupported as a matter of law by sufficient evidence to establish the only viable claim in the case, any findings embodied in that verdict could not be held binding on the district court on the Title VII claim.
 
 
 19
 Reviewing those findings independently of any such preclusive effect, they are not clearly erroneous in view of the conflicting evidence respecting Sullair's conduct in investigating and following up on Walker's charges. Consequently, we must affirm the district court's dismissal of the Title VII claim against Sullair.
 
 
 20
 AFFIRMED IN PART; REVERSED IN PART.